STALEY CONTINENTAL, INC., Plaintiff-Appellee, v. VENTERRA SALES AND MANAGEMENT COMPANY *et al.*, Defendants-Appellants (Household Commercial Financial Services, Inc., *et al.*, Defendants-Appellees).

First District (3rd Division)   No. 1—89—1878

Opinion filed March 31, 1992.

Jay A. Canel and Peter M. King, both of Chicago, for appellants.

Robert J. Driss, Michele Odorizzi, and Jodi G. Eisenstadt, all of Chicago, for appellee Household Commercial Financial Services, Inc.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff Staley Continental, Inc. (Staley), brought this interpleader action for a determination as to whether it should deduct brokers' commissions owed to defendants Venterra Sales and Management Company and Jayboc Realty, Inc. (Brokers), from the monthly rental payment due to defendant Household Commercial Finance Services, Inc. (Household). Paine/Wetzel Associates, Inc. (Paine/Wetzel), was also a defendant *sub judice*, but is not a party to this appeal. The parties filed cross-motions for summary judgment. The trial court denied Paine/Wetzel and the Brokers' motion for summary judgment and granted summary judgment in favor of Household. On appeal, the Brokers contend that (1) the rental payments at issue were not subject to Household's mortgage and security interest; (2) Household consented to a subordination of its senior security interest in the rental payments at issue; (3) a question of fact exists as to the issue of consent making summary judgment improper as a matter of law; and (4) equity demands that the Brokers receive the commissions they earned. We affirm.

In December 1984, Wieboldt Stores, Inc. (Wieboldt), entered into a commercial lease agreement to lease a portion of the Wieboldt Distribution Center located at 250-300 S. Wieboldt Drive, Des Plaines, Illinois (Distribution Center), to Bit O'Gold Foods, Inc. (Bit O'Gold).

Three commercial real estate brokers were involved in the negotiations and execution of the lease. Paine/Wetzel represented Bit O'Gold; Venterra represented Wieboldt; and Jayboc acted as the coordinating broker on the deal. Wieboldt paid a commission on this original lease, which is not at issue in this matter.

On December 19, 1985, Household loaned Wieboldt $32.5 million. The loan was secured by a mortgage on Distribution Center, a security agreement, a financing statement, and an assignment of lease and rents, which included Wieboldt's rights and obligations under the December 1984 lease with Bit O'Gold. On December 20, 1985, Household recorded the above-mentioned documents with the Cook County recorder of deeds.

The mortgage and assignment of lease and rents gave Household a security interest in "Rents," which were defined in the security agreement as:

> "All rents, issues, profits, royalties, avails, income and other benefits derived or owned by the Mortgagor directly or indirectly from the Real Estate, the Lease-hold Estate or the Improvements."

On July 23, 1986, Wieboldt and Bit O'Gold entered into the first amendment to their lease (First Amendment). First Amendment provided for the lease of additional space in Distribution Center to Bit O'Gold and the payment of additional rents to Wieboldt. Wieboldt, however, did not have sufficient cash on hand to pay the Brokers' commissions for the services performed in arranging First Amendment. By agreement of Wieboldt, Bit O'Gold and the Brokers, Bit O'Gold assigned a portion of its rent due to Wieboldt to the Brokers over the next 36 months to cover the payment of the Brokers' commissions. The parties to First Amendment failed to obtain the express written consent of Household as required by section 1.15 of the mortgage and assignment of rents section of the December 1985 Household-Wieboldt loan agreement.

Later in July 1986, CFS Continental, Inc. (CFS), purchased Bit O'Gold. Pursuant to the purchase, Bit O'Gold assigned its interest in the lease with Wieboldt to CFS. On or about January 1, 1987, CFS merged with and into Staley. As a result of the merger, Staley succeeded to all the rights and obligations of CFS.

On September 23, 1986, Wieboldt filed for involuntary bankruptcy in United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

In 1987, significant roof repairs were required at the Distribution Center. Wieboldt did not have sufficient cash on hand to effectuate

the repairs. On May 12, 1987, Wieboldt and Staley entered into the second amendment to the lease (Second Amendment), which provided that Staley would make and pay for the necessary repairs to the roof, but would receive a rent reduction over the next 47 rental payment periods equal to the cost of the repairs. On June 4, 1987, the bankruptcy court approved the Second Amendment.

On October 28, 1987, the bankruptcy court approved the sale of Distribution Center from Wieboldt to Business Realty, Inc. (BRI), a wholly owned subsidiary of Household, subject to Household's mortgage and security interest and Staley's lease. Between November 1987 and February 1988, Staley paid BRI the monthly rent, less the Brokers' commissions and deductions for roof repairs.

On March 18, 1988, Household demanded, and BRI consented to, direct rental payments from Staley to Household pursuant to the mortgage and assignment of rents. The payments amounted to the full amount of the lease rental payments less the agreed upon deductions for roof repairs. Household refused to allow a deduction for the Brokers' commissions.

On May 6, 1988, Staley filed this interpleader action for a determination as to whether it should deduct the Brokers' commissions from the rental payments to Household. At the close of discovery, the Brokers and Household filed cross-motions for summary judgment. On June 9, 1988, the trial court entered an order denying Paine/Wetzel and the Brokers' motion for summary judgment and granting summary judgment in favor of Household on the basis that Household's prior perfected security interest gave it a right to the rents at issue until Wieboldt's debt was paid in full. This appeal followed.

The Brokers contend that the rents at issue were not subject to Household's mortgage and security interest. We disagree.

It has been well established in this State since 1845 that creditors can take steps under the law to secure the payment from debtors of indebtedness from both subsequent secured creditors and unsecured creditors. (See Ill. Ann. Stat., ch. 30, par. 30, Historical Note, at 495 (Smith-Hurd 1969).) Deeds, mortgages, powers of attorney, and other instruments relating to or affecting the title to real estate shall be recorded in the county in which such real estate is located, and shall take effect and be considered notice at the moment of filing as to all creditors and subsequent purchasers of a prior interest in the real estate. (Ill. Rev. Stat. 1989, ch. 30, pars. 27, 29, 30.) Assignment of rents documents such as the one found in the present case are deemed interests which are authorized to be recorded as an "instrument relating to or affecting the title of real estate" in order

to obtain priority over subsequent secured and unsecured creditors. See Ill. Rev. Stat. 1989, ch. 30, par. 27; *Kahn v. Deerpark Investment Co.* (1969), 115 Ill. App. 2d 121, 253 N.E.2d 121.

■ It is plain that the definition of rents set forth in the security agreement unambiguously encompasses the rental payments in issue. In addition, when Household filed the mortgage and assignment of lease and rents with the Cook County recorder of deeds on December 20, 1985, it had an interest which could be protected. Accordingly, we conclude that Household followed all necessary steps set forth under the law to ensure that its security interest in Distribution Center and the accompanying rental payments in issue would have priority over all unsecured and any subsequent creditors arising after December 20, 1985.

The Brokers' second argument is that Household consented to the subordination of its security interest in Distribution Center and the accompanying rental payments in issue by failing to object to the bankruptcy court's approval of Second Amendment. We disagree.

Section 1.15 of the Household-Wieboldt loan agreement, which had been properly recorded on December 20, 1985, contained the following provision:

> "1.15. *No Assignments; Future Leases.* The mortgagor will not cause or permit any Rents, issues, profits, Leases, Contracts for Sale, or other contracts relating to the Premises, or any interest in any thereof, to be assigned, transferred, conveyed, pledged or disposed of, to any party other than the Mortgagee without first obtaining the express written consent of the Mortgagee thereto."

It is undisputed that Household did not give express written consent to any subordination of its interests. The Brokers contend, however, that Household's tacit acceptance of First Amendment during the bankruptcy court's approval of Second Amendment constitutes consent to subordination of its security interest in Distribution Center and the accompanying rents to the Brokers. This contention is without merit.

Second Amendment involves merely a substitution of payment for the roofing repairs from Wieboldt to Staley because of Wieboldt's cash shortage. Staley received a decrease in its rental payments to Wieboldt in an amount equal to the payments made on the expenditures for the roofing repairs. While the cash received by Wieboldt is decreased by the amount of the reduced rent, there is an equal increase in the value of Distribution Center by the amount of the roof repairs. Thus, there is no threat of impairment of Household's collat-

eral or change in its position as a secured creditor as a result of Second Amendment which would require Household to object to the approval of Second Amendment by the bankruptcy court. Accordingly, Household's failure to object cannot be considered consequential to the issue of consent.

■ Our review of the record does not support a finding that Household consented to the subordination of its security interest in Distribution Center to the Brokers. Furthermore, even if we were to rule that the failure of Household to object to First Amendment was considered consent to anything, that consent would be only to the existence of an interest junior to its own and not to subordination of its senior interest to the Brokers. We, therefore, conclude that Household neither expressly nor implicitly consented to a subordination of its security interest in Distribution Center to the Brokers.

■ The Brokers next argue that a question of material fact exists as to when Household became aware of First Amendment making summary judgment improper as a matter of law. We disagree. The issue of when Household obtained knowledge of First Amendment is immaterial to the issue of consent or to any issue in this case. The mere existence of factual questions that are unrelated to the essential elements of the cause of action will not preclude a court from granting summary judgment to the moving party. (*Village of Beckmeyer v. Wheelan* (1991), 212 Ill. App. 3d 287, 294, 569 N.E.2d 1125, 1130.) Accordingly, because the issue of consent is of no consequence to the determination of any matter in dispute in this case, we conclude that the trial court did not err when it granted summary judgment in favor of Household.

■ The Brokers' final contention is that equity requires a result favoring the Brokers. We are unsure, however, which equitable doctrine the Brokers would like us to invoke since they failed to assert any specific doctrine or principle. There are no cases in Illinois either presented by the Brokers or which we could find that support the proposition that lien priorities should be disregarded if a junior creditor has contributed some added value to the property in question.

While we recognize that the Brokers spent over 300 hours arranging First Amendment and that Household derived a substantial benefit in both the value of its collateral and the amount of money it received in rental payments because of the Brokers' efforts, Household loaned Wieboldt millions of dollars relying on the enforceability of its liens. It followed the letter of the law in obtaining and perfecting a security interest in the collateral it received. The Brokers were or should have been aware of Household's prior recorded security inter-

est in Distribution Center and the accompanying rental payments, and were fully aware of Wieboldt's poor financial condition when the parties entered into the subsequent leasing arrangement. Thus, the risks to the Brokers which were present in their undertaking were or should have been fully understood in light of all the existing circumstances.

In conclusion, we will respect the well-established law of secured collateral and secured transactions. Any other holding would allow debtors to unilaterally destroy the secured creditor's senior interest in rent or the like simply by assigning it to a third party rather than collecting it directly themselves.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

TULLY* and CERDA, JJ., concur.

---

*Justice White heard oral arguments in this case prior to his retirement. Justice Tully was designated the third member of the panel and has read the briefs and listened to the tapes.