In the MATTER OF WHEATON OAKS OFFICE PARTNERS LIMITED PARTNERSHIP, Debtor–Appellant.

No. 93–2856.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1994.

Decided June 23, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 4, 1994.*

---

* Hon. John L. Coffey did not participate in the consideration of the suggestion for Rehearing En Banc.

Dale W. Bruckner (argued), Linda Haviland, Peregrine, Stime, Newman, Ritzman & Bruckner, Wheaton, IL, for appellee.

Arthur G. Jaros, Jr., Richter, Jaros & Dudgeon, Oak Brook, IL (argued), for debtor-appellant.

Before CUMMINGS, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

Wheaton Oaks Office Partners ("WOOP"), is a Chapter 11 debtor-in-possession of certain commercial real estate located in Wheaton, Illinois (the "properties"). Firstar Du-Page Bank ("Firstar") holds a recorded first mortgage and assignment of rents on the properties. The issue before us concerns the relative rights of the parties, following bankruptcy, to the rents generated from those properties. Long before WOOP filed for reorganization under Chapter 11, the properties in question had been the subject of a protracted foreclosure action brought by Firstar in Illinois state court. In that foreclosure action, Firstar filed a motion seeking enforcement of its assignment of rents. To resolve this motion, the parties entered into, and the state court adopted, a series of Agreed Orders requiring WOOP to establish an account at Firstar into which it was required to deposit all rents and other monies collected from the properties shortly after their receipt. On appeal, we are asked to determine whether this provision sufficiently activated Firstar's assignment of rents so as to create a pre-petition "interest" in them within the meaning of 11 U.S.C. § 363(a) of the Bankruptcy Code. If so, then the rents are "cash collateral," which means that WOOP cannot use these rents without first securing permission from Firstar or the bankruptcy court. *See* 11 U.S.C. § 363(c)(2)(A), (B). If not, then the rents go into the general bankruptcy estate free and clear from any claims of Firstar. Both the bankruptcy court and the district court determined that under Illinois law, this provision in the Agreed Orders sufficiently created a pre-petition interest in the rents within the meaning of § 363(a) to trigger the cash collateral protections of the Bankruptcy Code. For reasons different from those of both lower courts, we agree that the rents were subject to a pre-petition security interest, and therefore affirm the lower courts' determination that the rents are cash collateral under 11 U.S.C. § 363(a).

**I.**

WOOP, an Illinois limited partnership, was formed pursuant to an order entered on February 23, 1988, in the United States Bankruptcy Court for the Northern District of Illinois confirming a joint plan of reorganization resulting from Chapter 11 proceedings filed by four limited partnerships. The events leading up to WOOP's formation are relevant to the issue before us, so we recite them in some detail below.

*A. Background*

In the early 1980's, four limited partnerships, Group 54, Group 61, TGS–84 and Wheaton Oaks Partners (not to be confused with the present debtor, WOOP), each owned and operated one of four separate commercial office buildings located in Wheaton, Illinois. Together, these buildings comprised the office headquarters of a real estate business conducted under a group of affiliated companies known as "IRE." The mortgages on at least three of the four office buildings

were secured by a recorded first mortgage held by the DuPage Bank & Trust Company (the predecessor to Firstar).[1] Only these three mortgages are involved in this action. Each of these mortgages contained an assignment of rents clause which provided:

20. Assignment of Rents. Appointment of Receiver; Lender in Possession.

As additional security hereunder, borrower hereby assigns to Lender, the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable. Upon acceleration under paragraph 18 hereof or abandonment of the Property, and at any time prior to the expiration of any period of redemption following judicial sale, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender, or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only for those rents actually received.

Paragraph 18, referenced above, provided:

Except as provided in paragraph 17 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall mail notice to Borrower as provided in paragraph 14 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, fore-

closure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender at Lender's option may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. . . .

The limited partnerships defaulted on their loan obligations, and on October 2, 1985, DuPage commenced three separate foreclosure actions in Illinois state court against the properties. Later that month, on October 24, 1985, these three limited partnerships, along with the fourth, commenced proceedings for reorganization under Chapter 11 of the Bankruptcy Code. Consequently, the state court actions were automatically stayed pursuant to 11 U.S.C. § 362(a).

The four separate reorganization proceedings (the "predecessor bankruptcies") were consolidated by the bankruptcy court and, on February 23, 1988, the court entered an order confirming a Joint Plan of Reorganization. According to the Joint Plan, WOOP would be formed as a limited partnership and would acquire the properties and assume the liabilities of the four predecessor bankruptcies. As a result, WOOP's obligation to Firstar under the Plan was $833,969.87. The Plan also provided that Firstar would retain its status as first mortgagee on each of the properties. The Plan further required WOOP to make payments of principal and interest on the unpaid balance of the obligation at the rate of 10% per annum, in the amount of $8,047.99 per month. WOOP was also required to make monthly payments of ½ of the estimated general real estate taxes.

WOOP defaulted on several payments under the Joint Plan. In response, Firstar obtained relief from the automatic stay and reactivated the state foreclosure proceedings. In July of 1990, Firstar amended its original

---

1. It is unclear from the record whether DuPage held a mortgage on the fourth property.

state court foreclosure complaint to add WOOP as an additional defendant in each of the previously stayed foreclosure actions. Firstar then filed in each action identical motions entitled "Motion For Order Of Possession Or Enforcement Of Assignment Of Rents," seeking to be put in immediate possession of all three properties on which it held its mortgages or, in the alternative, that all future rents derived from the properties be paid directly to Firstar.

On November 15, 1990, the state court resolved Firstar's motions by entering Agreed Orders in each of the pending foreclosure proceedings. The Agreed Orders imposed numerous obligations upon WOOP, such as, delivering to Firstar copies of all current tenant leases, allowing Firstar, upon 24 hours notice, to conduct a complete audit of WOOP's financial records, and advising Firstar, at least monthly, on WOOP's ability to lease the buildings and raise additional capital. Of particular interest to both lower courts (but not to us, as we shall explain later) was paragraph 2 in each of the Agreed Orders, which provided:

2. Within three (3) days from the entry of this Agreed Order, WOOP shall establish a checking account in its name at the plaintiff bank ... and thereafter shall deposit into said account any and all rent receipts, special assessments, or any other moneys (hereinafter referred to collectively as "Rent") except for security deposits, which it shall thereafter collect from the tenants of the Premises. All such deposits must be made by WOOP within forty-eight (48) hours of its receipt of any Rent. Not later than five (5) days after the deposit of Rent payments into the WOOP account, WOOP will pay over to plaintiff all such funds, and they shall be applied by plaintiff to tax escrow arrearages, interest arrearages, current principal, current interest and current escrow obligations, to the extent they exist, in such amounts and proportions as plaintiff, in its sole and absolute discretion, shall determine.

In addition, paragraph 9 of the Agreed Orders provided that, in the event WOOP defaulted on any obligation imposed by the Order, then, following five days notice to

cure from Firstar, the following relevant provisions would immediately take effect without further court order:

a) WOOP shall be deemed to have assigned, granted and conveyed to plaintiff, all Rent and other moneys to which plaintiff is otherwise entitled to collect directly under the Assignment of Rents of applicable law. Said assignment shall be deemed to be general and absolute and intended to assign, grant and convey to plaintiff title to all such Rent, and other moneys;

b) To the extent necessary, if at all, plaintiff shall be deemed to be entitled to and to have exercised and perfected its rights to the rents generated by the Premises, and notwithstanding any provision of any other mortgage, court order, or other document, all future rents derived from the premises shall be irrevocably delivered to plaintiff as provided herein.

Finally, paragraph 12 of the Agreed Orders provided that "[t]his Agreed Order shall remain in full force and effect throughout the pendency of this proceeding," which continued until WOOP filed its own petition for reorganization under Chapter 11 of the Bankruptcy Code on January 30, 1992.

### B. Proceedings Below

After filing its petition for bankruptcy, WOOP remained in possession of its properties, *see* 11 U.S.C. § 1101, and, as a result of the automatic stay, ceased depositing the rents with Firstar as it had been doing pursuant to the Agreed Orders. On February 27, 1992, Firstar filed a motion, pursuant to 11 U.S.C. § 363(e), to bar WOOP from using the rents, claiming that they were "cash collateral" within the meaning of 11 U.S.C. § 363(a). Firstar argued that by virtue of the recorded assignment of rents provision in its mortgages, it had obtained a pre-petition security interest in the rents which gave it a cash collateral interest in the rents pursuant to §§ 363(a) and 552(b). In its answer, WOOP opposed this motion, arguing that since Firstar had not taken any actions to enforce its assignment of rents, such as taking possession of the property or appointing a receiver, its interest had not been "activated" and therefore it did not have a pre-

petition interest in the rents pursuant to §§ 363(a) and 552(b).

On April 2, 1992, the bankruptcy court held a hearing on Firstar's motion. At the conclusion of the hearing, the bankruptcy judge determined that, as a result of paragraph 2 of the Agreed Orders, WOOP had been acting in a receivership capacity as to the rents, which was enough under Illinois law to activate Firstar's assignment of rents prior to WOOP's petition for bankruptcy. Consequently, the bankruptcy court issued a bench ruling that Firstar had a valid prepetition security interest in the rents generated from the properties and that these rents constituted cash collateral within the meaning of 11 U.S.C. § 363(a). On April 15, 1992, the bankruptcy court entered a written order reflecting its earlier ruling and therefore barred WOOP from using the rents generated from the properties.

On April 24, 1992, WOOP filed its "Motion To Reconsider And Amend Order Determining Certain Rents To Be Cash Collateral Of DuPage Bank." In this motion, WOOP argued that paragraph 2 of the Agreed Order, by its own terms, did not create a prepetition security interest in the rents. Instead, a security interest would arise only through operation of paragraph 9 of the Agreed Order, which stated that in the event WOOP breached any of its obligations under the Agreed Order (including paragraph 2) and if this breach was not cured, then, without further order of the court, WOOP would be deemed "to have assigned" the rents to Firstar. Since there was never a showing that WOOP had breached any of its obligations under the Agreed Order, WOOP contended that a security interest never *arose* in the rents. Alternatively, WOOP argued that Firstar did not obtain a security interest through the execution of the assignment of rents provision in its mortgage because Firstar had not met the conditions precedent set forth in that provision, namely, abandonment of the property or acceleration of the mortgage note. Neither of which, according to WOOP, had ever taken place.

Following hearings on WOOP's motion on June 8, 1992, and July 31, 1992, the bankruptcy court adjusted somewhat from the reasons it previously gave in granting Firstar's motion to bar use of the rents. At this juncture, the bankruptcy court determined that the dispositive issue before it was whether paragraph 2 of the Agreed Orders by itself, without any action on the part of WOOP, created an "interest" in the rents within the meaning of 11 U.S.C. § 363(a). After ordering further briefing on the matter, the bankruptcy court, on September 29, 1992, issued another bench ruling, affirming its earlier conclusion that paragraph 2 of the Agreed Orders by itself constituted a recognizable interest under 11 U.S.C. § 363(a). Accordingly, the bankruptcy court denied WOOP's motion to reconsider and amend the court's earlier order.

The district court affirmed the bankruptcy court's decision that the rents were cash collateral. In doing so, the district court noted that under Illinois law, a mortgagee holding an assignment of rents must take certain steps to "activate" or enforce that assignment in order to create an interest or lien on the rents. *See* Memorandum Opinion and Order at 6 (citing *DeKalb Bank v. Purdy*, 166 Ill.App.3d 709, 117 Ill.Dec. 606, 520 N.E.2d 957 (1988), *appeal denied*, 122 Ill.2d 572, 125 Ill.Dec. 215, 530 N.E.2d 243 (1988)). The district court found that by requiring WOOP to deposit its rents directly with Firstar, paragraph 2 of the Agreed Orders gave Firstar the right to use the rents, thereby creating a § 552(b)· security interest in the rents before the commencement of bankruptcy. Accordingly, the district court affirmed the bankruptcy court's determination that the rents were cash collateral within the meaning of 11 U.S.C. § 363(a) and affirmed the bankruptcy court's order barring WOOP from using the rents pursuant to 11 U.S.C. § 363(c)(2).

## II.

The issue before us is whether the bankruptcy court and the district court properly classified the rents from the properties as "cash collateral" under § 363(a) of the Bankruptcy Code. As noted above, both courts found that Firstar, prior to bankruptcy, had taken steps to activate its assignment of rents, which, in turn, were sufficient to cre-

ate a pre-petition security interest in the rents for purposes of § 552(b). On appeal, WOOP raises several challenges to this determination, yet only one is worth developing: whether an executed, yet unenforced assignment of rents clause contained in a mortgage *creates* a pre-petition security interest under § 552(b)? We shall more fully explore this later on in our opinion. But before doing so, we must first examine the cash collateral provisions of the Bankruptcy Code.

## A. Cash Collateral Provisions of the Bankruptcy Code

Generally, a debtor-in-possession, as trustee, *see* 11 U.S.C. § 1107(a), is free to use, sell or lease property of the bankruptcy estate in the operation of the debtor's business. *See* 11 U.S.C. § 363(c)(1). Property of the estate consists of not only all property in which the debtor holds an interest upon the commencement of bankruptcy, *see* 11 U.S.C. § 541(a), but also the income, or "rents," generated from that property. *See* 11 U.S.C. § 541(a)(6). This is significant because the rents generated from the property would become part of the bankruptcy estate. This means that in these reorganizations, the trustee has at his disposal the rents which, if unencumbered, may freely be used to fuel the debtor's reorganization (and to pay his attorneys) without having to obtain consent from the creditors or the bankruptcy court.

An important limitation on the trustee's unfettered ability to use rents during reorganization is the cash collateral provisions contained in 11 U.S.C. § 363. "Cash collateral" consists of "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a). This definition is intentionally broad and includes "the ... rents ... of property subject to security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a). A determination that rents constitute cash collateral places several limits upon the trustee's use of those rents during the administra-

tion of the debtor's reorganization. Section 363(c)(2) provides that a trustee may not use cash collateral unless each creditor with an interest in the cash collateral consents, or the bankruptcy court, after notice and hearing, authorizes such use. Furthermore, § 363(c)(4) requires the trustee to keep cash collateral segregated from other property in the bankruptcy estate.

As stated in § 363(a), rents are cash collateral only if they are subject to a § 552(b) security interest. Section 552(b) is itself an exception to the general rule in § 552(a) that property acquired after the commencement of bankruptcy goes into the bankruptcy estate free and clear of any pre-bankruptcy security interests. Section 552(b) provides that if, prior to the commencement of bankruptcy, the debtor and creditor enter into a security agreement creating a security interest in property and its rents, then "the security interest extends to such ... rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law." *Id.*

Section 101(50) of the Code defines a "security agreement" as an "agreement that creates or provides for a security interest." A "security interest," under the Code, is defined as a "lien created by an agreement." 11 U.S.C. § 101(51). A "lien," in turn, is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). There is no dispute that, prior to WOOP's petition for bankruptcy, Firstar and WOOP (actually WOOP's predecessors; but as pointed out earlier, WOOP assumed all these liabilities upon formation) entered into an agreement assigning the rents from the properties to Firstar. It is also undisputed that the rent assignments contained in Firstar's mortgages were intended as additional security for the notes on the properties. The rent assignments provide that *"[a]s additional security hereunder,* Borrower hereby assigns to Lender the rents of the Property...." Furthermore, the assignment provides that in the event Firstar obtained possession and started collecting rents, then "[a]ll rents collected ... shall be applied first

to payment of costs of management of the Property and collection of rents, ... and then *to the sums secured by this Mortgage.*"

■ The only question for us to resolve under § 552(b), then, is to what extent the parties' security interest in rents is affected "by applicable non-bankruptcy law." Assignments of rents are interests in real property and, as such, are created and defined in accordance with the law of the state in which the property is located, which in this case, is Illinois. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979)); *Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 37 (3d Cir.1993); *In Re Vienna Park Properties*, 976 F.2d 106, 112 (2d Cir.1992). A federal court in bankruptcy is not allowed to upend the property law of the state in which it sits, for to do so would encourage forum shopping and allow a party to receive "a windfall merely by reason of the happenstance of bankruptcy." *Butner*, 440 U.S. at 55, 99 S.Ct. at 918 (quotations omitted) (citations omitted). Thus, in determining whether the parties' assignment of rents created a "security interest" under Illinois law, our goal is to ensure that Firstar "is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Id.* at 56, 99 S.Ct. at 918.[2] In other words, the primary reason why Firstar obtains a security interest in the rents "must stem from state law." *Id.* at 57, 99 S.Ct. at 919. It is that law to which we now turn.

*B. Illinois Law on Assignment of Rents*

■ Illinois adheres to the general rule that rents are an incident of possession. *De Kalb Bank v. Purdy*, 166 Ill.App.3d 709, 117 Ill.Dec. 606, 610, 520 N.E.2d 957, 961 (1988) (citing *Taylor v. Osman*, 239 Ill.App. 569, 574 (1926)); 27 Illinois Law and Practice, *Mortgages* § 117 at 201 (1956). Thus, a mortga-

gor, as the party in possession and owner of statutory right of redemption,[3] is entitled to any rents generated from the property as long as he retains possession, without having to account for them to the mortgagee. *See De Kalb Bank*, 117 Ill.Dec. at 610, 520 N.E.2d at 961 (citing *Taylor*, 239 Ill.App. at 575); 27 Illinois Law and Practice *Mortgages* § 117 at 201 (1956). This general rule, however, can cause problems for the lender should the debtor default on the underlying note. In these circumstances, the mortgagee would like to start collecting the rents generated from the property and apply them towards any deficiencies under the note. But as stated above, the only way he can get at these rents is if he actually obtains possession of the property. It is unlikely that he will get a consensual relinquishment of possession from the mortgagor, who may have it in mind to collect the rents during the pendency of foreclosure and not make his mortgage payments, *see* James McCafferty, *The Assignment of Rents in the Crucible of Bankruptcy*, 94 Com.L.J. 433, 437 (1989), so the mortgagee will usually have to obtain pre-foreclosure possession through the courts, either by being placed in actual possession or having possession taken on his behalf through a receiver. However, the Illinois Mortgage Foreclosure Law ("IMFL"), Ill.Ann.Stat. ch. 735, para. 5/15–1101 to 5/15–1706 (Smith–Hurd 1993), provides that a mortgagee of non-residential real estate is entitled to pre-judgment possession or appointment of a receiver only if so authorized by the terms of the mortgage instrument. *See* Ill.Ann.Stat. ch. 735, para. 5/15–1701(b)(2), 5/15–1702(a), 5/15–1704(a); *see also Home Life Ins. v. Amer. Nat. Bank and Trust*, 777 F.Supp. 629, 631 (N.D.Ill.1991) (right to pre-judgment possession or appointment of a receiver is conditioned upon terms of the mortgage authorizing possession of the property in the event of default). Without

---

**2.** Although *Butner* was decided under the Bankruptcy Act, its rationale equally applies under the new Bankruptcy Code. *See Wolters Village, Ltd. v. Village Prop., Ltd.*, 723 F.2d 441, 443 (5th Cir.), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984).

**3.** Generally, the mortgagor owns what is called the right of redemption. *See* Ill.Ann.Stat. ch.

735, para. 5/15–1212 (Smith–Hurd 1993). This gives the mortgagor a period of time in which he can "redeem" the property by paying off all sums specified in the mortgagee's judgment of foreclosure, which consists of all accrued principal and interest secured by the mortgage, plus other assorted costs and fees. *See* Ill.Ann.Stat. ch. 735, para. 5/15–1603(b), (d) (Smith–Hurd 1993).

any contractual provision in the mortgage or trust deed authorizing pre-judgment possession or receivership, the mortgagee has no colorable claim under the IMFL to be put in possession, and will simply have to wait until judgment of foreclosure and the expiration of the period of redemption before he will be able to obtain possession and start collecting rents. "The time interval between the filing of a foreclosure petition and the termination of the statutory right of redemption may be as long as two years...." *In re Mich. Ave. Nat. Bank*, 2 B.R. 171, 185 (Bankr.N.D.Ill. 1980). Since 1980 the time lapse has probably not changed significantly, which means that during this lengthy interim "the mortgagor ordinarily is able to maintain possession and collect rents without any accountability for the rents collected...." *Id.; see also* McCafferty, *supra* 94 Com.L.J. at 437 ("The inability of the mortgagee to reach the rents under the ancient law permitted the mortgagor to "milk" the property, i.e., collect the rents and not make payments called for by his mortgage agreement. Not a good situation for lenders.").

■ To alleviate this problem and allow creditors the opportunity to reach the rents sooner than the completion of foreclosure proceedings, Illinois allows mortgagees to include in their mortgages assignment of rents clauses, giving them a sufficient interest in the rents to authorize the appointment of a receiver through whom the mortgagee can begin collecting rents. *See, e.g., Bagley v. Ill. Trust & Sav. Bank*, 199 Ill. 76, 64 N.E. 1085, 1086 (1902); *First Nat. Bank of Joliet v. Illinois Steel Co.*, 174 Ill. 140, 51 N.E. 200, 202 (1898); *De Kalb Bank*, 117 Ill.Dec. at 610, 520 N.E.2d at 961; *Metropolitan Life Ins. Co. v. W.T. Grant Co.*, 321 Ill.App. 487, 53 N.E.2d 255, 261 (1944); *Taylor v. Osman*, 239 Ill.App. 569, 574 (1926); *West v. Adams*, 106 Ill.App. 114, 117 (1903); *cf.* McCafferty, *supra* 94 Com.L.J. at 437 (1989) ("In an effort to reduce their risk of loss and enhance their power to reach the rents after default, creditors began to include 'assignment of rents'.... The theory apparently was that such provision would create some sort of contractual 'interest' in the rents in favor of the mortgagee, which might be enforced without having to complete a judicial

foreclosure...."). Such assignments do not grant the mortgagee a lien on specific rents in the hands of the mortgagor, for this would violate the general rule that a mortgagor does not have to account to the mortgagee for rents while he remains rightfully in possession. Instead, an assignment of rents provision allows the mortgagee to take certain steps after default, but before the completion of foreclosure proceedings, to obtain possession of the property and start collecting the rents; but until he takes such steps the mortgagor is entitled to keep the rents. *De Kalb*, 117 Ill.Dec. at 610, 520 N.E.2d at 961; *Metropolitan Life*, 53 N.E.2d at 261; *Taylor*, 239 Ill.App. at 574; 27 Illinois Law and Practice, *Mortgages* § 118 at 202 (1956).

■ As stated earlier, the question before us is whether, under Illinois law, such an assignment of rents, upon execution, creates a sufficient "lien" on the rents to constitute a pre-petition "security interest" under § 552(b). WOOP asserts, with scant references to Illinois law, that the assignment of rents provision merely granted Firstar a right to a *future* creation of a lien. According to WOOP, this lien would come into existence only when (1) the conditions precedent contained within the assignment of rents provision itself (default and acceleration) were satisfied, and (2) Firstar took the necessary steps under Illinois law (possession or receivership) to "activate" the lien. WOOP argues that because these conditions were never met, no lien, and thus no security interest, was ever *created* prior to the petition for bankruptcy.

■ The only problem with WOOP's argument is that it is contrary to the law of Illinois. Nearly a century ago, the Illinois Supreme Court examined a similar assignment of rents provision in a mortgage and stated "[u]nder this clause in the mortgage *a lien is given*, by express words, upon the rents and profits, and such an equitable lien a court of equity will enforce." *First Nat. Bank of Joliet*, 51 N.E. at 202 (1898) (emphasis added); *see also Bagley*, 64 N.E. at 1086 (1902) ("Such a provision in the mortgage *created a valid lien on the rents*, which equi-

ty will enforce....") (emphasis added).[4] More recently, the Illinois Appellate Court for the Fifth District stated that "[u]nder well-established Illinois law, a clause in a real estate mortgage pledging rents ... *creates an equitable lien upon such rents* ... of the land, which may be enforced by the mortgagee upon default by taking possession of the mortgaged property." *Anna Nat. Bank v. Prater*, 154 Ill.App.3d 6, 107 Ill.Dec. 26, 33, 506 N.E.2d 769, 776 (1987) (emphasis added). What is particularly interesting about *Prater* is that one of the decisions upon which it relied in making this statement, *Liss v. Harris*, 304 Ill.App. 173, 26 N.E.2d 133 (1940), considered and rejected arguments very similar to those raised in today's appeal by WOOP. In *Liss*, the mortgage contained a provision pledging the rents to the mortgagor, and further provided that after filing for foreclosure, the mortgagee was entitled to have a receiver appointed to collect the rents, which were first to be applied towards the note, and then to any remaining deficiency following the sale of the mortgaged property. The mortgagors defaulted under the note and, pursuant to the terms of the mortgage, the mortgagee had a receiver appointed who collected the rents during the entire foreclosure proceedings up until the sale of the property. Following sale, the mortgagees were left with a deficiency but never obtained an official decree of deficiency as required under the pledge of rents. Neverthe-

less, the equity court ordered that the remaining rents collected by the receiver be handed over to the mortgagee to pay off the deficiency. On appeal, the mortgagors argued that under the terms of the mortgage, the mortgagee merely obtained a right to a lien, which could be matured only through an entry of deficiency, and that since the mortgagee took no affirmative steps to activate their lien, none existed. After surveying the law in this area, the appellate court rejected the mortgagors' arguments and concluded:

> *Under these provisions of the trust deed the mortgagees were given an equitable lien on the rents* as well as on the property itself, and subsequent sequestration of the rents through the appointment of a receiver was an enforcement of that lien....
>
> ....
>
> ... *The mortgagees acquired a lien under the provisions of the trust deed, and not a mere right to a lien,* as the owners of the equity contend.

*Liss*, 26 N.E.2d at 137–38 (emphasis added). Thus, from our review of the decisions in this area of Illinois real property law, it is clear to us that by executing this assignment of rents, and without having to take any further action, Firstar obtained a sufficient "lien" under Illinois law to rise to the level of a § 552(b) "security interest" in the rents generated from WOOP's properties.[5,6]

---

4. We also note that over sixty years ago this court in *In Re Wakey*, 50 F.2d 869 (7th Cir.1931), relying upon *First Nat. Bank of Joliet, Bagley,* and a host of other Illinois decisions, stated that "[i]t is not questioned that the rents and profits of land ... may be the subject of a valid lien." *In Re Wakey*, 50 F.2d at 870.

5. There is language from *De Kalb Bank* suggesting that the execution of an assignment of rents merely gives the assignee a *right* to acquire a lien. *See De Kalb Bank*, 117 Ill.Dec. at 610, 520 N.E.2d at 961 (stating that an assignment of rents provision in a mortgage " 'merely gives the mortgagee a right to take such steps whereby he can obtain an equitable lien, as it is sometimes called, on the rents and profits....' ") (quoting *Taylor*, 239 Ill.App. at 574). Yet these statements are not in accord with the Illinois Supreme Court's statements in *First Nat. Bank of Joliet* and *Bagley*. In determining the content of state law, our job is to look to the decisions from the state's highest court. *See* 19 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal*

*Practice and Procedure* § 4507 at 91 (1982). There has been no indication from the Illinois Supreme Court that it no longer follows the rule in *First Nat. Bank of Joliet* and *Bagley*. Accordingly, since the Supreme Court has stated otherwise, we may not follow the contrary statements by the Illinois Appellate Court in *De Kalb Bank*.

6. For these reasons, any inquiry into the effect of paragraph 2 (or paragraph 9) of the Agreed Orders is unnecessary to our resolution of this appeal. It makes no difference whether the Agreed Orders effectively made WOOP a receiver, since such an inquiry is premised upon the assumption that, under Illinois law, the failure of a mortgagee to take the steps necessary to enforce his assignment of rents renders that interest non-existent. Yet under Illinois law, an executed, yet unenforced assignment of rents still creates a lien in rents, and this lien has priority relative to third parties based on the date of recordation. Thus, any inquiry into the present enforceability of a security interest in rents is not relevant in determining whether that interest ex-

*C. Perfection and § 544*

This is not the end of our inquiry, however, for, even if a party has a security interest under § 552(b), this same provision requires pre-petition security interests to survive the rigors of the trustee's "strong arm" powers under § 544 before they can reach cash collateral status. *See* 11 U.S.C. § 552(b) ("Except as provided in section[ ] ... 544....""). Section 544 of the Code vests a trustee with the rights of a hypothetical lien creditor whose lien was perfected at the time of the bankruptcy petition. If the holder of a security interest in the debtor's property has not taken the necessary steps under applicable law to put other potential creditors on notice of his interest (perfection) then the trustee in bankruptcy, upon commencement of the case, can subordinate or "avoid" that interest, thus relegating it to a status of a general creditor of the bankruptcy estate. *See Appeal of Swartz,* 18 F.3d 413, 416 (7th Cir.1994).

As was the case with the creation of a security interest, so too the perfection of a security interest in rents is determined by Illinois law. Recent Illinois decisions have stated that an assignment of rents provision may be perfected by recording the assignment in the county where the property is located. *See, e.g., Travelers Ins. v. First Nat. Bank of Blue Island,* 250 Ill.App.3d 641, 190 Ill.Dec. 340, 345–46, 621 N.E.2d 209, 214–15 (1993) (determining that the holder of an assignment of hotel receipts, which are rents, "perfected a first priority security interest ... through ... recording loan documents with the ... recorder of deeds"); *Staley Continental v. Venterra Sales,* 228 Ill.App.3d 174, 170 Ill.Dec. 4, 6, 592 N.E.2d 440, 442 (1992) (assignment of rents are "deemed interests which are authorized to be recorded as 'instrument[s] relating to or affecting the title of real estate,' in order to obtain priority

over subsequent secured and unsecured creditors") (citing Ill.Rev.Stat. ch. 30, para. 29, 30 (Smith–Hurd 1991) (recodified in Ill. Ann.Stat. ch. 765, para. 5/30, 31 (Smith–Hurd 1993)). It is undisputed that Firstar properly recorded the underlying mortgage containing the assignment of rents well before the filing of WOOP's petition for bankruptcy, so as of the filing date, Firstar had perfected a superior lien under Illinois law that was not avoidable in bankruptcy under § 544.

This is not to say that an intervening judgment creditor would not be entitled to collect specific rents if it obtained possession of the mortgagor's property before a mortgagee holding a previously recorded assignment of rents took steps to enforce his rights to the rents. Clearly he can; but this does not render the mortgagee's rights subordinated in priority. So said the Illinois Supreme Court in *Stevens v. Blue,* 388 Ill. 92, 57 N.E.2d 451 (1944). There, A executed a mortgage on behalf of B, in which, in addition to giving B a mortgage on A's property, also granted B an assignment of the rents, which B could enforce upon default. B promptly filed the mortgage and assignment, thus obtaining a perfected interest in the rents. Meanwhile, one of A's other creditors, C, had obtained a judgment against A, and executed that judgment by having a receiver appointed to collect the rents from A's property. Following this, A defaulted under B's note, and B filed for foreclosure as well as for the appointment of receiver to collect the rents in accordance with its assignment of rents. As for the rents C collected while she was in possession, the Illinois Supreme Court held that when the judgment creditor, *"whose lien was subordinate to that of appellant,* procured the appointment of ... [a] receiver, to collect rents to be applied to her claim, she had a right to receive the rents and profits unless and until appellant applied to the circuit

---

ists for purposes of § 552(b). As the Second Circuit recently put it in determining whether, under Virginia law, the holder of an unenforced assignment of rents had a security interest in rents for purposes of §§ 363(a) and 552(b): "the enforceability of an interest is an issue distinct from the issue whether a security interest exists under § 552(b). The failure of a secured party to perform enforcement procedures prior to bank-

ruptcy merely renders an interest inchoate, not nullified." *In Re Vienna Park,* 976 F.2d at 112. Although *Vienna Park* was examining assignment of rents under Virginia law, the principles articulated by that court underscore our conclusion under the law of Illinois that an assignment of rents, upon execution, creates a sufficient security interest to constitute cash collateral under § 363(a).

court for enforcement of her *senior lien.*" *Stevens,* 57 N.E.2d at 453 (emphasis added).[7] The court went on to state that

> the rule is ... where a receiver has been appointed by the court and it is subsequently called to the attention of the court that another *has rights in the property* subject to the receivership *superior* to the party for whose benefit the receiver is appointed, the court will not deprive such *superior lienholder* of his rights.

*Id.* (citations omitted) (emphasis added). So we see that under Illinois law, even if a junior lienholder "wins the race" to possession, his right to collect the rents is still subject to the previously recorded, yet unenforced rent assignment of a previous mortgagee. If it were not so, that is, the mortgagee's superior right to the rents could be extinguished by virtue of an intervening judgment creditor, then how could the Illinois Supreme Court in *Stevens* declare the intervening judgment creditor to be a "subordinate" lienholder? Thus, Firstar, by recording its mortgage and assignment of rents before bankruptcy, obtained a superior lien that was not avoidable in bankruptcy under § 544. Moreover—and this brings us back to the core issue of today's decision—if, as WOOP contends, no security interest in rents comes into existence under Illinois law until the mortgagee takes steps to enforce his interest, how then do we explain *Stevens'* holding that the mortgagee's unenforced assignment of rents was a superior *lien*? It is clear, then, that under Illinois law, the failure to enforce an assignment of rents does not destroy the legal existence of an effective, enforceable security interest in those rents which came into being upon execution and was perfected upon recordation. And that is enough, under §§ 552(b) and 544, to ensure that a pre-petition security interest in rents will carry on after bankruptcy, thus qualifying such rents as cash collateral under § 363(a).

---

**7.** This is logically consistent with the general rule in Illinois that until a mortgagee with rights in the rents takes steps to enforce his lien, he has no right to collect specific rents in the hands of the mortgagor. Because the mortgagor in possession still retains the right to the rents, these rents

## III.

The rents generated from the properties were properly classified as "cash collateral" under § 363(a) of the Code. Under Illinois law, an executed assignment of rents creates a lien on future rents, which is a sufficient interest in property to qualify as a security interest under § 552(b). Furthermore, assignment of rents can be perfected by recording them in the county where the property is located. Firstar properly recorded its assignment. Thus, it obtained a perfected security interest in the rents that would not be voided by the trustee in bankruptcy under § 544. As a result, Firstar possessed a prepetition security interest in rents pursuant to § 552(b), making any post-petition rents cash collateral within the meaning of § 363(a). Therefore, we AFFIRM the order of the district court.

can be attached by the mortgagor's creditors, who, by taking possession, simply step into the shoes of the mortgagor, and, accordingly, acquire his right to collect specific rents. *See* 27 Illinois Law and Practice, *Mortgages* § 120 at 206 (1956).