In re BELLEVUE PLACE
ASSOCIATES, Debtor.

BELLEVUE PLACE ASSOCIATES,
Plaintiff,

v.

CAISSE CENTRALE DES BANQUES
POPULAIRES and Meridien Hotels
Investments Group Inc., Defendants.

Bankruptcy No. 94 B 9270.
Adv. No. 94 A 00891.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 1, 1994.

Steven B. Towbin, Michael J. Golde, D'An-
cona & Pflaum, Chicago, IL, Special Tax
Counsel for Bellevue Place Associates.

J. Douglas Bacon, Latham & Watkins, Chicago, IL, Special Counsel to Bellevue Place Associates, Rush Bellevue Development Corp., 21 East, Inc. and RAP Management.

David F. Heroy, Thomas C. Wolford, Neal Gerber & Eisenberg, Chicago, IL.

James H.M. Sprayregen, Wendy L. Chronister, Kirkland & Ellis, Chicago, IL, for defendant Caisse Centrale Des Banque Populaires.

Kathryn M. Gleason, Office of U.S. Trustee, Chicago, IL.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary Complaint relates to Debtor's bankruptcy proceeding filed under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Debtor here seeks adjudication of conflicting lien claims over rent and non-rent revenues from the hotel owned by Debtor. Trial was held. Having considered the oral testimony, documentary evidence, stipulations of the parties, arguments of counsel in support of their respective positions, and all pleadings filed, the Court now makes and enters the following Findings of Fact and Conclusions of Law. Pursuant thereto, all such revenues are found to constitute cash collateral of the bank holding a first lien thereon, and judgment will enter accordingly.

### INTRODUCTION

Debtor owns the Meridien Hotel in Chicago, Illinois ("Hotel"). Caisse Centrale Des Banques Populaires ("CCBP" or the "Bank") asserts that it perfected title to and became the owner of all pre-petition hotel revenues (including both room revenues and non-room income) pursuant to its perfected first mortgage and related documents.

CCBP contends that all post-petition revenue generated by Meridien's operation of the Hotel constitutes an interest in real property, i.e., "rent" under applicable Illinois law, and that rights with respect to all such revenue is governed by applicable Illinois real property law. Alternatively, and as a fallback position, it argues that its perfected security interest in hotel revenues at least attached to that portion of post-petition revenues attributable to room rental.

The Debtor, Bellevue Place Associates ("BPA"), defaulted on the mortgage, and CCBP obtained a state court order to place the mortgagee bank in possession of the hotel revenues, but did not actually take possession thereof. BPA and Meridien Hotel Investments Group, Inc. ("MHIG"), a second mortgagee and operator of the hotel, argue that CCBP was required by law to take actual possession of the pre-petition hotel revenues before it could claim perfected lien rights thereon. BPA and MHIG also assert that all post-petition revenue generated by MHIG's operation of the Hotel is personal property, i.e., "accounts" within the meaning of the Illinois Uniform Commercial Code rather than "rents" from the realty. Therefore, they contend that rights of the parties with respect to such revenue is governed by the Illinois Commercial Code.

Alternatively, MHIG and BPA argue that at a minimum the portion of hotel revenues attributable to hotel services other than room rental (e.g., revenues from non-room service and bar operations) is personal property, not "rents."

### FINDINGS OF FACT

1. On May 9, 1994, BPA filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code").

2. BPA filed this adversary complaint ("Complaint") against CCBP and MHIG to determine BPA's, CCBP's, and MHIG's respective rights in hotel revenues alleged to be property of the estate.

3. From May 9, 1994, through July 1, 1994, BPA acted as a debtor-in-possession pursuant to § 1107 and § 1108 of the Bankruptcy Code. A series of hearings ensued, including the hearing on this Complaint. As noted in earlier Findings in the related BPA bankruptcy proceeding, Meridien now has total control over the Debtor such that appointment of the Chapter 11 Trustee was

warranted. On July 1, 1994, this Court ordered appointment of a Chapter 11 trustee under 11 U.S.C. § 1104. Later, the Court denied motions to abstain, dismiss, and modify stay. All parties to this adversary proceeding also participated fully in those earlier contested proceedings. Therefore, Findings of Fact made and entered by the court in connection with those orders are adopted by this reference as a part of these Findings. 171 B.R. 615 and 171 B.R. 628.

## The Parties

4. BPA is an Illinois general partnership formed primarily for the purpose of owning a hotel currently known as Le Meridien Chicago, located at 21 East Bellevue, Chicago, Illinois.

5. CCBP is a French banking corporation. CCBP refinanced the debtor's loan obligations in February 1990 (the "February 1990 Refinancing").

6. Meridien Hotel, Inc. ("MHI") is a New York corporation engaged primarily in the business of operating hotels under the name Le Meridien. MHIG is a French-owned Delaware corporation and an affiliate of MHI. As used herein, the term "Meridien" refers collectively to MHIG and MHI. Concurrent with the February 1990 Refinancing discussed below, MHI became manager of the Hotel and continues to manage the Hotel during this bankruptcy proceeding.

## 1990 Refinancing

7. In February 1990, CCBP loaned BPA $37 million ("First Mortgage Loan") for use in refinancing a prior mortgage loan and also for general operating purposes.

8. In consideration for the First Mortgage Loan, CCBP received a first priority security interest in the Hotel property in and the "rents, issues and profits" from the Hotel. CCBP's First Mortgage granted CCBP a first priority perfected security interest in

> ... all improvements, tenements, easements, fixtures and appurtenants thereto belonging and all rents, issues and profits thereof for so long and during all such times as Mortgagors may be entitled thereto (which are pledged primarily and on a parity with said real estate and not secondarily)....

CCBP recorded its mortgage with the Cook County Recorder of Deed's Office on February 15, 1990, document no. 90074942 ("First Mortgage").

9. CCBP became and remains a secured creditor of the debtor through execution and delivery of the following documents:

- Loan Agreement between BPA and CCBP dated February 14, 1990 ("Loan Agreement");
- Mortgage Note executed February 14, 1990, in the principal amount of $37 million, payable to CCBP; and
- First Mortgage.

10. In addition to the First Mortgage, CCBP obtained and filed with the Secretary of State of Illinois UCC–1 and UCC–2 financing statements covering the Hotel's furniture, fixtures, and equipment. Meridien does not dispute CCBP's first priority perfected security interest in the furniture, fixtures, and equipment of the Hotel. CCBP admits it did not receive a lien on the Hotel's accounts, inventory, or general intangibles, and does not dispute MHIG's lien on that property.

11. As a precondition to the First Mortgage Loan and to induce CCBP to fund the First Mortgage Loan, MHIG posted a $5 million debt service guaranty ("Guaranty") secured by an irrevocable standby letter of credit in favor of CCBP (the "LC"). In connection with closing of the First Mortgage Loan, MHIG and BPA executed a Cash Shortfall Agreement dated February 14, 1990 ("Cash Shortfall Agreement"), pursuant to which all amounts funded under the Guaranty were deemed to constitute loans by MHIG to BPA ("Second Mortgage").

12. The $5 million LC was to remain outstanding until BPA fully repaid CCBP's First Mortgage Loan or until the LC was fully drawn down. CCBP was the only party entitled to draw on the $5 million LC. Under terms of the First Mortgage Loan and LC Loan Note, CCBP has recourse against assets of BPA, but not against BPA individually.

13. MHIG's Second Mortgage contained a Rider providing that

Mortgagor [BPA] hereby grants to Mortgagee [MHIG] a security interest in all of Mortgagor's [BPA's] present and future "Accounts", "Equipment", "Inventory" and "General Intangibles" (as such terms are defined in the Uniform Commercial Code as adopted in the State of Illinois) now or hereafter located on or related to the premises and Mortgagee [MHIG] shall have, in addition to all rights and remedies provided herein and in any other agreement, commitment or undertaking made by Mortgagor [BPA] to Mortgagee [MHIG], all of the rights and remedies of a "Secured Party" under the aforesaid Uniform Commercial Code. To the extent permitted under applicable law, this Mortgage shall be deemed to be a "Security Agreement" (as such term is defined in the aforesaid Uniform Commercial Code).

Paragraph 3 of the Rider to Meridien's Mortgage on the Hotel, rents, and profits provides that "the lien of this Mortgage is and shall be subject and subordinate to the lien of that certain mortgage of even date herewith between Mortgagor [BPA] and Caisse Centrale des Banques Populaires affecting the premises." Meridien recorded its Second Mortgage with the Cook County Recorder of Deed's Office ("Recorder's Office") on February 15, 1990.

14. On February 15, 1990, MHIG filed UCC–1 and UCC–2 financing statements covering all of the Hotel's accounts, inventory, and general intangibles currently owned and all accounts, equipment, inventory hereafter acquired by BPA.

15. Pursuant to the Cash Shortfall Agreement, MHIG has paid $5 million to CCBP in interest payments on CCBP's loan, and BPA is indebted to MHIG in that amount. MHIG's claim from that payment remains unpaid.

16. All liens granted by BPA to CCBP and Meridien are granted only by virtue of the First Mortgage and the Second Mortgage, respectively. Neither CCBP nor Meridien are party to any other security instrument in connection with BPA's 1990 refinancing, and neither CCBP nor Meridien obtained any lien interests through any document other than their respective mortgages.

17. In connection with the First Mortgage Loan, MHIG obtained the legal opinion of Latham and Watkins ("Latham Opinion"). That firm observed therein that

[w]e [Latham & Watkins] have acted as special counsel to Bellevue Place Associates ... Rush Bellevue Development Corporation ... Twenty One East, Incorporated ... and RAP Management in connection ... with the making of certain loans by Meridien Hotels Investments Group, Inc.... pursuant to that certain Cash Shortfall Agreement dated as of February 14, 1990....

18. Neither the Latham opinion nor any draft thereof was ever delivered to CCBP in connection with the closing of the First Mortgage Loan. The Latham opinion was carefully worded and did not opine as to the perfection or priority of any security interest or lien in any collateral or as to Meridien's right or title to any of the Hotel revenues. The Latham opinion did not address whether any of Meridien's collateral for the Second Mortgage Loan constituted realty or personalty, nor did it state whether such collateral might be covered by real property law or by the Illinois Commercial Code.

19. The law firm of Proskauer, Rose, Goetz, and Mendlesohn ("Proskauer") acted at times mentioned herein as counsel to Meridien in connection with the First Mortgage Loan and the Second Mortgage Loan. Neither (1) the Closing Document Summary dated February 14, 1990, nor (2) the April 23, 1993, memorandum to the "Working Team," make any reference to Meridien having any rights in hotel receipts that were senior to CCBP.

20. On February 14, 1990, a preclosing was held at the Proskauer firm's law offices where the loan documents were exchanged and examined by the parties and/or their representatives. The parties did not discuss the question of whether Meridien had any rights in the hotel revenues.

### Second Mortgage Subordinated to First Mortgage

21. As noted earlier, the Second Mortgage on the Hotel, rents, issues, and profits is expressly subordinated to CCBP's First Mortgage under paragraph 3 of the Rider. Moreover, Paragraph 2.3 of the Cash Shortfall Agreement provides in pertinent part that

> ... Lender's [Meridien's] right to payment under the LC Loan Note [Second Mortgage] shall be subordinate only to the rights of the First Mortgagee [CCBP] under the Loan Agreements on the following terms: **In the event of an Event of Default (as defined in the Loan Agreement) relating to the payment of the principal amount of the First Mortgage Loan and/or the payment of any interest thereon when due, no further payment shall be made by Owner [BPA] to Lender [Meridien]** on account of the LC Loan Note [Second Mortgage] unless and until such default [on the First Mortgage Loan] is cured or the unpaid principal amount of the First Mortgage Loan or any interest accrued thereon (whichever is in default under the First Mortgage) is paid in full, whichever is the first to occur. **No amount of any payment made to ... [Meridien] in accordance with this ... [Cash Shortfall Agreement] shall be paid to ... [CCBP].**

(Emphasis added.)

The effect of this contractual language is that, in event of an Event of Default on the First Mortgage Loan, no further payments may be made by BPA to Meridien on account of its Second Mortgage until the default is cured or CCBP's First Mortgage is paid in full. At the same time, payments BPA previously "made" to Meridien in accord with this Agreement shall not be disgorged by Meridien and paid to CCBP.

22. Section 3.2 of the Cash Shortfall Agreement directs the use of cash flow on a going concern basis to the extent the Hotel has a "net operating profit," and the first mortgage is not in default. The term "Net Operating Profit" refers to the excess of income over "fixed charges," and "fixed charges" is defined to include interest on the First Mortgage Note. After payment of fixed income charges (including interest on the First Mortgage Loan), and to the extent there is a positive cash flow and BPA is not in default to CCBP under the First Mortgage Loan, this section of the Cash Shortfall Agreement directs payment first of Meridien's LC fees and interest, then (if there are sufficient funds) payment of any accrued and unpaid interest in the LC Loan, then payment of principal on the First Mortgage, and finally payment of principal on the LC Loan.

The meaning of this provision is clear: Only absent an event of default on the First Mortgage Loan, and to the extent BPA has available cash flow, may it make payments on outstanding and accrued and unpaid interest on Meridien's LC Loan.

23. Section 3.2 also sets forth the priority payment scheme in event of sale or other disposition of the Hotel or a refinancing of the First Mortgage. In each of these scenarios, BPA is to apply the proceeds (after payment of any transaction costs) first to the payment of principal and accrued interest on the First Mortgage Loan, next to LC fees, interest, and accrued interest, and then to the payment of all principal on MHIG's LC Loan. This provision again makes clear the relative priority of CCBP's and MHIG's liens. It plainly means that, in the event the collateral securing both MHIG's and CCBP's liens (i.e., Hotel) is disposed of, the proceeds of such disposition are to be applied first to interest and principal payments on CCBP's First Mortgage Loan, and only then on MHIG's Second Mortgage.

### Management Agreement

24. Concurrently with execution of the First Mortgage Loan documents, BPA entered into a management agreement ("Management Agreement") with Meridien for management and operation of the Hotel. The Management Agreement granted Meridien authority to manage the day-to-day operation of the Hotel, including the ability to withdraw funds from the Hotel's operating account ("Operating Account"). Although BPA established the Operating Account,

Meridien designated signatories of the Operating Account.

25. The Management Agreement defines the term "Room Revenues" to mean "for any hotel (including the Hotel), all revenues derived from such hotel from the rental of rooms of such Hotel." Joint Exs. 5, 12.

26. Wolfgang Triebnig, the general manager of the Hotel, testified that his understanding of the term "room revenue" comports with the definition of "Room Revenue" in the Management Agreement, i.e. "all revenues derived in any way from the rental of rooms of such hotel." Consistent with this understanding, Mr. Triebnig testified that between 65% and 69% of the Hotel's total gross revenues are derived from rental of hotel rooms. The Hotel's Statements of Profit and Loss for the years 1990, 1991, 1992, and 1993 show actual room revenue, as a percent of the Hotel's gross revenue, of 64%, 68%, 62.6%, and 63.3%, respectively.

### Events Leading Up to the Foreclosure Action

27. In a letter agreement between CCBP and Meridien executed at the time of closing on the First Mortgage Loan, Meridien had obtained an option to purchase the indebtedness under the First Mortgage Loan. CCBP agreed to give thirty days notice to Meridien prior to exercising its foreclosure rights if BPA defaulted on the First Mortgage Loan.

28. BPA came into default under the First Mortgage Loan less than two years after the 1990 closing when it failed to make interest payments then due. Due to BPA's continuing default, CCBP elected to declare the entire amount of principal and interest outstanding immediately due and payable.

29. On December 8, 1993, CCBP notified Meridien that an Event of Default under the First Mortgage Loan had occurred and was continuing and that CCBP intended to foreclose on its First Mortgage on or after January 10, 1994. CCBP also inquired whether Meridien intended to exercise its option to purchase BPA's indebtedness to CCBP. In a letter dated December 10, 1993, Meridien responded that it would consider purchasing the outstanding indebtedness to CCBP pro-vided that "our [Meridien's] existing $5.0 million financing, as well as our anticipated additional capital of $2.0 million, will be placed on a *pari passu* basis with your [CCBP's] new/restructured financing."

30. On December 14, 1993, CCBP again notified Meridien of its intent to foreclose on its First Mortgage. July 11 Findings and Conclusions, ¶ 14. On December 20, 1993, Meridien informed CCBP that it was not in a position to make any determination to exercise its option to purchase the First Mortgage Loan.

### State Court Foreclosure Proceedings

31. On January 11, 1994, CCBP filed its Complaint to Foreclose Mortgage ("Foreclosure Complaint") in the Circuit Court of Cook County, Chancery Division ("State Foreclosure Court"). On January 12, 1994, the State Foreclosure Court entered an order placing the mortgagee CCBP in possession ("Possession Order").

32. The Possession Order permitted Meridien to continue use of the Hotel receipts only for reasonable expenses necessary to carry on day-to-day operation of the Hotel. That Order directed Meridien to continue to manage the Hotel's daily operations. It provided that "[a]ll revenues, rents, issues and profits ('Revenues') of the Hotel, including hotel receipts and proceeds derived in any way from the operation of the Hotel, other than Necessary Expenses ('Other Expenses') shall be placed in an escrow account." Thus the court ordered segregation of all such revenues of the Hotel to the extent it generated revenues in excess of those required for the reasonable operating expenses of the Hotel ("Excess Funds"). Such Excess Funds were to be placed in an escrow account selected, directed, and controlled by CCBP ("Escrow Account").

33. Pursuant to the Possession Order, CCBP established the Escrow Account at American National Bank. However, no Excess Funds were actually into the Escrow Account as required by the Possession Order. Despite entry of the Possession Order, Meridien did not alter its banking practices with respect to the Hotel operating accounts.

34. On January 14, 1994, Meridien sought to have the Possession Order vacated or amended. This motion was continued to March 18, 1994, then to April 18, 1994, and then to May 3, 1994. As of the commencement of the bankruptcy case, Meridien's motion to vacate the Possession Order was still pending and undetermined.

35. On April 18, 1994, the State Court Judge, *sua sponte*, directed CCBP, as mortgagee-in-possession, to identify a property manager of the Hotel to substitute for Meridien because that judge understood Meridien to have a financial interest in the Hotel. In opposition to the property manager proposed by CCBP, Meridien filed a pleading in the State Foreclosure Court contending that its claim against BPA by virtue of its Second Mortgage had no value, arguing that

> ... while [Meridien] has a technical mortgage on the hotel, even the Bank [CCBP] believes that [Meridien's] mortgage has no real value (and thus [Meridien] has no real financial interest in the Hotel).

> (footnote 1) ... Contrary to the Court's impression, Meridien has no financial interest in the Hotel other than the payment of its ordinary management fees for services currently rendered.

Before this Court, it takes a much different position.

### The Bankruptcy Filing

36. BPA filed its bankruptcy petition on May 9, 1994, before any determination of CCBP's motion for summary judgment on the Foreclosure Complaint and before determination by the state judge as to whether Meridien should be removed as manager.

### Hotel Revenues

37. The precise amount of cash in the Hotel's operating accounts as of the bankruptcy filing was not established by evidence. However, from testimony by Mr. Triebnig, the general manager of the Hotel, it is found that there was about $470,000.00 in the Operating Accounts as of May 9, 1994.

38. The Hotel generated approximately $12 million in gross revenue in 1993. As earlier stated, in that year 63.3% of the gross

revenue was from room revenue, leaving 36.7% of the gross revenues (or $4,404,-000.00) from non-room revenue, including revenue from the sale of food and beverages and from other ancillary services of the Hotel. (The restaurant and bar of the Hotel generated approximately $1.5 million in annual gross sales, as part of the non-room revenue.)

39. It is undisputed that CCBP has a first priority perfected security interest in the Hotel's furniture, fixtures, and equipment, as well as in the real estate. The above computation of non-room revenues does not account for any charge for use of the premises or of the Hotel's furniture, fixtures, and equipment ("Use Expense") to produce the non-room revenues. For example, if the Hotel leased the restaurant space and equipment to a third party operator rather than operating the restaurant itself, the rental income collected by the Hotel from such third party operator would be subject to CCBP's First Mortgage Lien. Allocation of the appropriate share of the fixed charges and the Use Expense for the furniture, fixtures, and equipment, and the real estate would further reduce the net non-room revenues. However, the present evidence record does not permit such allocation.

40. Garage revenues are included in the foregoing non-room revenues. CCBP argues that, like use of the hotel rooms, the garage use is a direct use and occupation of the physical property of the Hotel and proceeds thereof are subject to its lien.

### CCBP's Debt

41. The principal amount currently owed CCBP is about $37 million. The total amount of principal and pre-petition interest due to CCBP as of commencement of the bankruptcy proceeding was approximately $42 million.

### Meridien's Answer to the Adversary Complaint

42. The Complaint here alleges that, were the Court to determine that hotel receipts are "accounts" rather than "rents," BPA is entitled to ownership of the Hotel

receipts, unencumbered by CCBP's and MHIG's liens. In its Answer, MHIG admitted, pursuant to the Cash Shortfall Agreement, that it had no right to payment while the CCBP loan was in default. *See* Meridien's Answer to Complaint, ¶ 26. However, it has argued that, until the default to CCBP is cured and MHIG can be paid, BPA is entitled to ownership, use, and possession of the Hotel revenues. Since Meridien totally controls the Debtor, this viewpoint is not surprising.

### Miscellaneous

43. Any conclusions of law set forth in these Findings of Fact shall be deemed additional Conclusions of Law, and any additional facts set forth in the following Conclusions of Law shall be deemed additional Findings of Fact. As previously noted, Findings of Fact contained in prior rulings of this Court in the related bankruptcy proceeding also stand as additional Findings of Fact.

### *CONCLUSIONS OF LAW*

### *Jurisdiction and Issues*

This Complaint is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). The Court has jurisdiction to hear and determine this proceeding pursuant to 28 U.S.C. § 1334 and Rule 2.33 of the Local Rules from the United States Bankruptcy Court for the Northern District of Illinois.[1]

The two legal issues presented in light of the foregoing facts are: First, does CCBP's security interest in "rents, issues, and profits" extend to all Hotel revenues or only to room revenues? Second, were the defaults in mortgage agreements and the state court's possession order sufficient to perfect and vest ownership of the "rents, issues, and profits" in CCBP to the extent it had rights therein?

1. In CCBP's Answer to the Adversary Complaint, it asserted that this Court lacks jurisdiction over this Complaint and/or that permissive abstention under 28 U.S.C. § 1334(c)(1) is appropriate because the dispute here involves only two non-debtor parties, CCBP and Meridien, and thus resolution of this Adversary Complaint would in no way impact the size of the BPA estate. How-

### *Use of Parol Evidence*

■ Under Illinois law, when contract terms are unambiguous, they are to be given their clear and natural meaning, and rights of the parties are limited by terms expressed in the contract. *American Reserve Corp. v. Beigel & Sandler,* 1993 WL 62984 (N.D.Ill. 1993), and cases cited. "If a judge can make sense of a written contract without hearing testimony, his duty is to construe the contract without permitting the parties to introduce any evidence other than the contract itself." *LaSalle Nat'l Bank v. General Mills Restaurant Group, Inc.,* 854 F.2d 1050, 1052 (7th Cir.1988) (citations omitted).

The Illinois Supreme Court has provided that, when a contract is unambiguous:

> [b]oth the meaning of the instrument and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids ... What the parties to a written contract may have understood as to the meaning of the language used is not admissible in evidence. The intention or understanding of the parties, when there is a written contract in evidence, must be determined not from what the parties thought but from the language of the contract itself.

*Rakowski v. Lucente,* 104 Ill.2d 317, 323, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (1984) (citation omitted).

CCBP argues that the Court can decipher the respective rights and interests among CCBP, BPA and Meridien as to the Hotel and the Hotel receipts from language of the Mortgage Loan documents themselves.

None of the loan documents characterize the Hotel's revenues as either "rents" or "accounts." The loan documents make clear that "rents, issues and profits" of the Hotel were mortgaged to the Bank, and the "ac-

ever, in paragraphs 72 and 73 of Meridien's Proposed Findings and Conclusions, Meridien argues that, assuming *arguendo* the Hotel receipts are "accounts," such Hotel receipts belong to the BPA estate free and clear of any liens, including MHIG's. It is indeed clear that resolution of the issues here impacts on the size and control of the bankruptcy estate.

counts" were pledged to MHIG. However, the documents themselves do not specify which revenue sources apply to each contract term.

CCBP's mortgage is a pre-printed form mortgage granting CCBP a lien on the real estate, together with all "rents, issues and profits thereof." These terms are not further defined in CCBP's Mortgage or in CCBP's other loan documents, nor is there any other reference to a lien or security interest in favor of CCBP. The mortgage was recorded with the Cook County Recorder, but no documents were filed with the Secretary of State under the Illinois Uniform Commercial Code in order to grant CCBP any security interest in the Hotel's "revenues."

■ Thus, the loan documents may be said to contain a latent or extrinsic ambiguity. *See, e.g., Matter of Stoecker*, 5 F.3d 1022, 1029–30 (7th Cir.1993); *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 621–22 (7th Cir.1989). Accordingly, parol and other extrinsic evidence may be considered to aid in interpreting the loan documents. In this case, no significant evidence of conversations between the parties sheds any light on the undefined terms, but the circumstances and nature of the documents and transactions do.

A plain reading of the First Mortgage Loan documents reveals that such documents specifically and unambiguously provide that:

1) CCBP obtained a first priority perfected security interest in the Hotel and the Hotel Receipts as consideration for the First Mortgage Loan;

2) CCBP required MHIG to guarantee $5 million of CCBP's interest payments as a condition to providing the First Mortgage Loan;

3) CCBP appropriately drew the full amount of the LC ($5 million), which amount is deemed to be a loan from MHIG to BPA, secured by the Second Mortgage;

4) the Second Mortgage is senior to all other liens except the lien of the First Mortgagee;

5) in the absence of default and acceleration (which has occurred here), BPA would have had to make no principal payments on the First Mortgage Loan until 1997;

6) as long as BPA was not in default under the First Mortgage Loan, Meridien could be repaid on its Guaranty (i.e., the $5 million drawn by CCBP on the LC);

7) in the event of an Event of Default under the Loan Agreement, BPA can make no further payments to Meridien until BPA cures the default or pays all interest and the unpaid principal amount of the First Mortgage Loan to CCBP; and

8) in the present accelerated loan situation, BPA cannot pay any amounts to Meridien until CCBP's First Mortgage Loan is paid in full.

■ During the trial, Meridien was given an opportunity to present parol evidence to support its interpretation of latent ambiguity in the First Mortgage Loan documents. Meridien, however, failed to adduce any competent parol evidence. For parol evidence to be probative, it must reflect the communicated understanding between the parties. As the Seventh Circuit has stated,

> ... a signatory to a contract is bound by its ordinary meaning, even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared ... This sense of "intent" denotes agreement between the parties and is not a license to allow undisclosed intent to dominate.

*Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir.1988).

Meridien simply produced no evidence of a communicated understanding between the parties that would alter the apparently plain meaning of CCBP's and MHIG's loan documents. Evidence that one party has thought to himself or herself what his or her intent is does not constitute parol evidence.

Moreover, the extrinsic evidence supports CCBP's contention that it has a first priority perfected security interest in all of the Hotel Receipts. The definition of room revenues in Meridien's own Management Agreement and the testimony of one of Meridien's witnesses as to their understanding of the definition of

room revenues in connection with the hotel industry is directly contrary to Meridien's assertions that such room revenue does not constitute "rent."

■ Further, conduct of the parties after the 1990 refinancing supports a conclusion that CCBP has a first priority perfected security interest in the Hotel Receipts. Where the terms of an agreement are not clear, subsequent conduct of parties to such agreement may be used to construe the contract. *See, e.g., Kroll v. Sugar Supply Corp.,* 116 Ill.App.3d 969, 974, 72 Ill.Dec. 396, 400, 452 N.E.2d 649, 653 (1st Dist.1983) ("It is a familiar rule of construction that, where the terms of an agreement are in any respect doubtful or uncertain and the parties have by their own conduct placed a construction upon it which is reasonable, such construction will be adopted by the courts in the event of litigation concerning it.") (citing *Pocius v. Halvorsen,* 30 Ill.2d 73, 81, 195 N.E.2d 137 (1963)).

■ Meridien, by its own actions after the closing of the First Mortgage Loan, concedes its subordinated position vis-a-vis CCBP with respect to the hotel receipts. When CCBP inquired whether Meridien intended to exercise its option to purchase the indebtedness to CCBP, Meridien made a counterproposal under which its claim to the hotel receipts would be *pari passu* with CCBP's rights to the hotel receipts. That subsequent conduct supports this Court's conclusion that CCBP has an interest in the hotel receipts senior to Meridien's alleged interest.

### CCBP Obtained a First Priority Perfected Security Interest In the Rents, Issues and Profits of the Hotel in 1990

Property interests are created and defined by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Thus, state law determines whether hotel revenues constitute "rents."

■ Liens on rent are interests in real property and are created and defined in accordance with the law of the state in which such property is located. *Butner,* 440 U.S. at 54, 99 S.Ct. at 917. The Illinois Uniform Commercial Code ("IUCC") expressly ex-

cludes from its applicability "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." 810 ILCS 5/9–104(j). Thus, Illinois real property law, not the IUCC, governs perfection of an interest in rents. *See, e.g., In re Schaumburg Hotel Owner Ltd. Partnership,* 1989 WL 359490 *3 (Bankr.N.D.Ill. 1989) (Schmetterer, J.) and cases cited.

■ The First Mortgage clearly and unambiguously grants CCBP a first lien on the Hotel and the "rents, issues and profits" of the Hotel. Pursuant to Illinois law, CCBP properly recorded the First Mortgage in the Cook County Recorder of Deed's Office on February 15, 1990. Thus, CCBP has a first priority perfected security interest in the Hotel and in the "rents, issues and profits" of the Hotel.

### CCBP's Security Interest in "Rents, Issues, and Profits" Includes Hotel Revenues from Room Rentals

■ Which of the Hotel revenues may be defined as "rents, issues, and profits" under Illinois state law? The Hotel revenues in this case include both room rentals and revenues from ancillary services (i.e., from the operation of the bar, restaurant, room service, and gift shop).

Several courts have held that a mortgagee with only a real property lien on a hotel and its "rents" has no lien upon any hotel revenues whatsoever because none of those revenues are true rents in the nature of rent from real property, but rather they are accounts receivable subject to requirements of the state Uniform Commercial Code. *See, e.g., In re Northview Corp.,* 130 B.R. 543, 546–48 (9th Cir. BAP 1991); *In re Lakeview Motor Inn, Inc.,* 167 B.R. 326 (Bankr.D.R.I. 1994); *In re Green Corp.,* 154 B.R. 819, 826 n. 19 (Bankr.D.Me.1993).

However, the rule in Illinois is to the contrary. This Court examined a similar issue in *In re Schaumburg Hotel Owner L.P.,* 1989 WL 359490. That opinion attempted to predict whether Illinois courts would classify hotel revenues as "rents" or "accounts receivable." It was concluded there that under

Illinois law all hotel revenues are "rents." This Court then ruled that

> [T]he Hotel's revenues fall within the general grant of security interest in "all rents, income and profits" and ... under Illinois law, all hotel receipts, including income from incidental services such as telephone and food and beverage service are deemed to arise primarily from the hotel occupant's use of the underlying real estate.

*Id.* at *5. At that time, no Illinois court had decided the question.

Four years later, in *Travelers Ins. Co. v. First Nat'l Bank of Blue Island,* 250 Ill. App.3d 641, 190 Ill.Dec. 340, 621 N.E.2d 209 (1st Dist.1993), an Illinois appellate court confirmed this Court's prediction as to how Illinois courts would treat the post-petition hotel revenues. *Travelers* concluded that all hotel revenues were included with the mortgagee's interest in "rents, issues, and profits." *Id.* at 646–47, 190 Ill.Dec. at 344–46, 621 N.E.2d at 213–15.

The dispute in *Travelers* arose between two lenders who each claimed a priority interest in the hotel's rents. The first mortgagee in *Travelers* had a recorded mortgage in which the debtor had granted a first priority lien in all rents, issues, proceeds, and profits. A second lender claimed a priority interest in the hotel revenues because the debtor had granted that junior lender a security interest in "all accounts receivable." *Id.* at 642, 190 Ill.Dec. at 341, 621 N.E. at 210. In *Travelers,* each lender had properly filed and recorded their interests. The Illinois Appellate Court affirmed the holding below that all hotel receipts from any source are rents.

The *Travelers* and *Schaumburg* decisions each relied, in part, on reasoning in *Springfield Hotel–Motel Assoc. v. City of Springfield,* 119 Ill.App.3d 753, 75 Ill.Dec. 575, 457 N.E.2d 1017 (4th Dist.1983), where an Illinois court considered the characterization of "hotel receipts" in a different context. In that case, the Illinois court was required to determine whether hotel room revenues derived from use of property or from providing of a service gave rise to taxes on an occupation providing services or to taxes on the use of property. Applying Illinois law, the Illinois

court stated that "[i]n the case of rental of a hotel or motel room, it is our opinion that any service ... is only incidental to the use of the tangible [real] property." *Id.* at 761, 75 Ill. Dec. at 580, 457 N.E.2d at 1022.

CCBP asks this Court to follow its *Schaumburg* opinion, and *Travelers,* arguing, under Illinois state law, that all post-petition revenues generated from the operation of a hotel are "rents," subject to a perfected pre-petition mortgage.

MHIG and BPA have asked this Court to reconsider its *Schaumburg* opinion and follow authorities interpreting the law of other states in determining that hotel revenues are more in the nature of "accounts" than "rents." Alternatively, they ask the Court to hold, under facts presented in this case, that CCBP's interest does not extend to non-room revenues.

Meridien contends that the Illinois Supreme Court, if called upon to decide the question, would follow other jurisdictions construing all hotel revenues as personal property and not follow *Schaumburg* and *Travelers,* in the interest of making the rule of law uniform among various jurisdictions. Meridien further argues, alternatively, that the Illinois Supreme Court would not likely regard income from services or sale of goods (especially from persons who are not guests) to be "incidental" to the use of realty and therefore would not include such income as "rents" the same as room revenues.

CCBP argues that economic realities mandate the conclusion that CCBP has a first priority perfected security interest in all the Hotel revenues. It supports this assertion by citing *In re Churchill,* 164 B.R. 607, 609 (Bankr.N.D.Ill.1994) (DeGunther, J.). *Churchill* reasoned that, when financing is provided to hotels, it is always an inherent part of the transaction that the mortgage will be paid from the hotel's entire future income stream. Thus, it is argued with good economic justification that the mortgage lien must be found to extend to all hotel revenues in addition to the bricks and mortar.

■ This Court also agrees with the ruling in *Travelers,* which held that a security inter-

est in "rents, issues, and profits" includes all hotel revenues, and with the reasoning in that opinion that

> [t]he conclusion that room revenue is not rent generated by real property is counterintuitive. It is indisputable that the common understanding is that rent is compensation for use of property for shelter. Also, the commonly held view is that a hotel guest primarily seeks shelter not service.

*Travelers,* 250 Ill.App.3d at 645, 190 Ill.Dec. at 344, 621 N.E.2d at 213. The reasoning of this Court in *Schaumburg* is adhered to and certainly supports the same conclusion. It is true that this Court is not bound by *Travelers* because federal courts are not bound by the decision of a state court unless the state's highest court in the jurisdiction has ruled on that issue. *See, e.g., Smith v. Navistar Intern. Transp. Corp.,* 957 F.2d 1439, 1443 (7th Cir.1992). This Court is therefore still free to predict the future ruling on these issues by the Illinois Supreme Court. However, the earlier prediction of this Court on that question looks even stronger in light of *Travelers,* and the same result is reached here.

MHIG also argues that CCBP failed to perfect its interest in the Hotel's revenues.

Upon entry of the January 12, 1994, state court order, when CCBP initially sought to enforce the First Mortgage, it held a secured interest in the rents, issues, and profits of the Hotel, including revenues attributable to room and non-room rentals. If it was necessary to perfect other than by recording its mortgage, the obtaining of that order was sufficient. *See De Kalb Bank v. Purdy,* 166 Ill.App.3d 709, 715, 117 Ill.Dec. 606, 610, 520 N.E.2d 957, 961 (2d Dist.1988) (citing *State Bank & Trust Co. v. Massion,* 279 Ill.App. 234 (1935), for the rule that "[a]ny proper procedure which would empower the court to

control rents and profits would be sufficient to vest the mortgagee with title to rents and profits.").

In *Matter of Wheaton Oaks Partners Ltd. Partnership,* 27 F.3d 1234, 1241–43 (7th Cir. 1994), the Seventh Circuit held, under Illinois property law, that an executed but unenforced assignment of rents clause in a mortgage was sufficient to create a pre-petition security interest under 11 U.S.C. § 552(b). CCBP therefore had no need to take any further action or other revenues to qualify its security interests in future room rents or other revenues for § 552(b) purposes.[2]

In this case, even without relying on the reasoning of *Wheaton Oaks,* the January 12 order placing the mortgagee in possession and ordering segregation of the accounts effectively perfected CCBP's security interest in Hotel revenues under Illinois real estate law. Moreover, *Wheaton Oaks* makes clear that, upon execution of the assignment of rents and without need for the bank to take further action, it thereby obtained a lien under Illinois law recognized as a § 552(b) security interest in rents.

### Income From Ancillary Services

Does CCBP's security interest include revenues from ancillary services as well as revenue from room services? When interpreting financing agreements and the language contained therein, as earlier observed, the court may resort to extrinsic evidence if the documents contain patent or latent ambiguity. In *Travelers* and *Schaumburg,* it was not necessary to examine intent of the parties because there was no question as to the extent of the parties's security interests. In each case, the court simply had to determine whether security interests provided in the financing agreements qualified as "rents, issues, and profits" for purposes of applying 11 U.S.C. § 552(b).

---

**2.** Section 552(b) provides:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such

security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b) (1994).

*Travelers* and *Schaumburg* both concluded that the first mortgage holder held a security interest in all of the post-petition hotel revenues, including ancillary services.

It is true that contract terms were clearly defined in *Travelers.* The mortgage and the collateral assignment of rents explicitly included "income" and "earnings," as well as "rents, issues, and profits." In addition, the mortgagee in that case had filed UCC–1 and UCC–2 financial statements, each of which stated that Traveler's security covered all "income, rents, issue, and profits arising from the operation of the Land and Improvements...." As an alternative holding, the court there concluded that Travelers in fact properly perfected its interest in the hotel's revenues under the UCC. Nonetheless, the court's reasoning there remains applicable here.

Contrary to Meridien's argument here, the financial arrangements in *Schaumburg* were not significantly different from those in this case. In *Schaumburg,* the security interests were drafted and conveyed in separate transactions. In this case, BPA conveyed security interests to CCBP and MHIG at the same time, but the Bank was in no way put on notice that MHIG claimed a lien on BPA's accounts receivable. Indeed, the BPA lawyers' opinion delivered to MHIG did not so contend nor was this assertion discussed with CCBP representatives. Moreover, the final documents between the same parties were consistent with the conclusion here that the Bank has a lien on all revenues.

It is further argued that, if this Court concludes that all hotel revenues constitute "rents" subject to CCBP's first mortgage, then there would be no "accounts receivable" subject to MHIG's security interest. However, this result does not violate the rule of contract construction that provisions of a contract should be read so no portion is rendered meaningless. *See Gleicher, Friberg & Assoc., M.D., S.C. v. Univ. of Health Sciences,* 224 Ill.App.3d 77, 85–6, 166 Ill.Dec. 460, 467, 586 N.E.2d 418, 424 (1st Dist.1991). When the Court reads CCBP's security interest as applying to ancillary service revenues as well as room rental revenues, the documents giving MHIG an interest in "accounts receivable" are not rendered meaningless, only subordinate. A secondary lienor cannot expect to prime a senior lien by arguing that such is necessary to give its lien meaning.

The recent holding of the Ninth Circuit in *In re Days Cal. Riverside Ltd. Partnership,* 27 F.3d 374 (9th Cir.1994), is duly noted. The court there held that "... revenues derived from the sale of food and drink and from other services provided by the hotel generate 'accounts' that cannot be classified as rent." *Id.* at 377 (citing *In re Bering Trader,* 944 F.2d 500, 502 (9th Cir.1991)). However, that ruling simply does not follow the reasoning of Illinois courts that have spoken on the issue, and it is Illinois law that applies here.

### The Bank Does Not "Own" the Revenues

■ While the Bank's security interest extends to all revenues, it does not "own" past collateral revenues as it contends.

A mortgage clause covering "rents, issues and profits" does not by itself entitle the mortgagee to the rents under Illinois law unless and until the mortgagee takes actual possession of the real property or until possession is taken on his behalf by a receiver. *Taylor v. Osman,* 239 Ill.App. 569, 574 (1926); *Purdy,* 166 Ill.App.3d at 709, 117 Ill.Dec. 606, 520 N.E.2d 957; *In re Woodstock Assoc. I, Inc.,* 120 B.R. 436, 446–49 (Bankr.N.D.Ill.1990) (Squires, J.); *Matter of Michigan Ave. Nat'l Bank,* 2 B.R. 171 (Bankr.N.D.Ill.1980) (Merrick, J.). Until the mortgagee takes such steps, the mortgagor is entitled to keep the rents. *Wheaton Oaks,* 27 F.3d at 1241.

Illinois law recognizes the segregation of rents for the mortgagee's benefit as an effective procedure in lieu of the mortgagee actually taking possession. *See Purdy,* 166 Ill. App.3d at 716–17, 117 Ill.Dec. 606, 520 N.E.2d 957; *Massion,* 279 Ill.App. at 234.

Notwithstanding its title, the state court January 12 order did not actually place the Bank as mortgagee in possession. Rather, it directed the segregation of an uncalculated portion of rents. Paragraph 1 of the January 12 order explicitly acknowledged that

MHI (as the owner's agent) "shall continue to manage the day-to-day operations of the Hotel," and paragraph 3 merely directed the segregation and deposit of the Hotel revenues into an escrow account to be established by the Bank. The entry of the January 12 order had no effect on the management and operations of the Hotel, and the owner (through MHI as its agent) continued in possession and control as it had prior to the entry of the January 12 order.

The record does not demonstrate that there were excess revenues to be segregated as contemplated by the January 12 order. The Bank did set up an escrow account in its own name at American National Bank ("Bank's Escrow Account"), but no Hotel revenues were ever deposited to that account. Thus, there is no evidence that excess revenues were accrued and collected from the time of the entry of the January 12 order through the bankruptcy filing date, or if there were, the Bank never obtained or controlled these revenues.

Because the pre-petition Hotel revenues were not actually segregated, the Bank never obtained possession or title to those revenues. *See Wheaton Oaks,* 27 F.3d at 1241. The Seventh Circuit held in *Wheaton Oaks* that post-petition rents constitute cash collateral even if the mortgagee did nothing to enforce its interest prior to the bankruptcy petition. However, that case did not decide the mortgagee's interest in pre-petition rents collected and deposited in the mortgagor's accounts prior to the bankruptcy filing. On that issue, the Seventh Circuit affirmed that the mortgagor "is entitled to any rents generated from the property as long as he retains possession, without having to account for them to the mortgagee." *Id.* at 1241.

The Bank's argument relies on *In re VIII S. Michigan Assoc.,* 145 B.R. 912, 914 (N.D.Ill.1992). There, the District Court held under Illinois law that the mortgagee had perfected its interest in office building rents which were the subject of its mortgage by notifying all of the tenants of the mortgagor's default and instructing the tenants to pay rent directly to the mortgagee. *Id.* at 913. Because the mortgagee had taken all steps required under Illinois law prior to the commencement of the mortgagor's bankruptcy case, office building rents were held not to constitute property of the estate. *Id.* at 914.

In *VIII S. Michigan,* the District Court based its decision primarily on *Century,* where a Seventh Circuit panel held that a mortgagee bank's security interest in rents from a debtor's apartment complex was perfected upon commencement of a foreclosure action and petition for appointment of a receiver. *Matter of Century Inv. Fund VIII Ltd. Partnership,* 937 F.2d 371, 372 (7th Cir.1991). In so holding, the Seventh Circuit noted that,

> [g]enerally speaking, if a **mortgagee has protected its security interests** in a mortgagor's property and rental proceeds by perfecting its liens under the requirements of state law, then **these interests generally do not become property of the bankruptcy estate.** Once the bankruptcy has been filed, the debtor has the right to use the proceeds only if the security interests were not perfected under state law.

*Id.* at 375 (emphasis added).

The Bank argues that facts in this case are analogous to the facts in *Century.* Here, CCBP, like the mortgagee in *Century,* sought to enforce its interests in the Hotel receipts prior to the commencement of the bankruptcy case by filing the State Court foreclosure action and seeking to be appointed mortgagee-in-possession.

Although the court in *Century* was obligated to follow Wisconsin law, the decision is still said to be persuasive because the laws of Wisconsin and Illinois are consistent in this regard. The Seventh Circuit has recognized that, under both Wisconsin and Illinois real property laws, rents are an incident of possession rather than a question of title. *See Wheaton Oaks,* 27 F.3d at 1241. (Illinois adheres to the general rule that rents are an incident of possession); *cf. Century,* 937 F.2d at 376 ("under the law of Wisconsin, the right to rents is an incident of possession . . . ."). Thus, under Illinois law, the proper method for a mortgagee to obtain title to rents is to obtain appointment of a receiver or to be placed in possession. In this case, as the mortgagee in *Century,* CCBP started to exercise its rights under Illinois law. The Pos-

session Order provided for CCBP to exercise control over surplus Hotel receipts. However, CCBP never put in possession and never actually obtained control over surplus funds, if there were any. Further, no receiver was appointed. Therefore, *Century, Wheaton Oaks,* and *VIII South Michigan* are distinguishable, and CCBP does not own the Hotel receipts which remain property of the estate pursuant to 11 U.S.C. § 541. *See also Matter of Willows of Coventry,* 154 B.R. 959 (Bankr.N.D.Ind.1993) (for discussion of *Century* and *South Michigan* cases).

## CONCLUSION

CCBP's security interest in hotel "rents, issues, and profits" is found to extend to the Hotel revenues attributable to room revenues as well as a security interest in the accounts receivable from ancillary services, but the Bank is not found to own these proceeds.

The Bank's counsel is by separate order required to submit a proposed draft judgment order in accord with the rulings herein.